LISA J. BAZANT, PLLC
GW Building
2722 3rd Avenue North Suite 400
P.O. Box 1832
Billings, MT 59103-1832
Phone:  406-696-2197
Fax: 406-248-4770
lisabazant@hotmail.com

Attorney for Defendant/Movant

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BILLINGS  DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff/Respondent,<br><br>vs.<br><br>LAMAR WEBSTER,<br><br>Defendant/Movant. | **Case No.**  CR 07-128-BLG-SPW<br>CV 17-155-BLG-SPW<br><br>**BRIEF IN SUPPORT OF AMENDED MOTION TO VACATE, SET ASIDE, OR CORRECT A SENTENCE BY A PERSON IN FEDERAL CUSTODY UNDER 28 U.S.C. § 2255** |

## INTRODUCTION

Comes now Defendant/Movant, Lamar Webster, by and through his counsel

of record, Lisa J. Bazant, and files this Amended Motion to Vacate, Set Aside, or

-1-

Correct a Sentence By a Person in Federal Custody under 28 U.S.C. § 2255.

This amendment is made pursuant to 28 U.S.C. § 2242 and Fed. R. Civ. P. 15(a).

## PROCEDURAL HISTORY

1. The Defendant, Lamar Webster, moves to vacate, set aside, or correct a sentence imposed in the District Court of Montana, Billings Division, in Cause CR 07-128-BLG-SPW.

2. Webster is imprisoned at Lompoc USP. Lompoc, California.  He is serving a sentence of 240 months.

3. An investigation into methamphetamine dealing in Billings, Montan, began in December, 2004.  Undercover officer Mike Gilluly of the Billings Police Department developed a relationship with an informant, Brandon Leclair, who made several controlled buys from Richard Todd.  In May, 2005, Gilluly purchased three ounces of crystal methamphetamine directly from Todd.  Todd was arrested and charged with drug crimes.  Thereafter, additional information lead to more arrests: Marcos Quinones, Dana Shearer, Chris Zarzoza and Timothy Bayes.

4. On September 24, 2007, the United States obtained an Indictment against Webster alleging he committed the offenses of Count I:  Conspiracy to

Possess with Intent to Distribute Methamphetamine; Count II:  Possession with Intent to Distribute Methamphetamine; Count III:  Money Laundering Conspiracy; and Count IV: Money Laundering, in violation of 21 U.S.C. §§ 846 and 841(a)(1) and 18 U.S.C. §§1956(h) and 1956(a)(1)(A), respectively.  (Dkt. No. 1).

5.   Webster entered not guilty pleas to all counts.  (Dkt. No.  7).

6.   On December 1, 2008, Webster proceeded to trial.  (Dkt. Nos. 70, 72, 73). On December 4, 2008, Webster was of all counts.   (Dkt. No. 81).

7.   On April 17, 2009,  the Court sentenced Webster to the Bureau of Prisons for a term of Life on Counts I and II and 240 months on Counts III and IV. (Dkt. No. 93).

8.   Webster appealed his conviction and sentence to the Ninth Circuit Court of Appeals.  In an opinion issued September 30, 2010, the Court affirmed the conviction. (Dkt. No. 119).   A subsequent Petition for Writ of Certiorari was denied.  (Dkt. No. 123).

9.   On March 15, 2012, Webster filed a §2255 motion. (Dkt. No. 124).  The motion and the certificate of appealability were denied by the Court on June 4, 2012.  (Dkt. No. 127).  Webster filed a Notice of Appeal.  (Dkt. No. 128). On October 04, 2012, the Court of Appeals denied Webster's request for a

certificate of appealability.  (Dkt. No. 130).  A subsequent Petition for Writ

of Certiorari was denied.  (Dkt. No. 133).

10.   On November 22, 2016, Webster was granted an Executive Clemency,

reducing his sentence to 240 months.  (Dkt. No. 136).

11.   On September 26, 2017, Webster filed a Motion for Plain Error Review.

(Dkt. No. 137).  The Court dismissed for lack of jurisdiction, noting that the

Court of Appeals had not authorized Webster to file a second §2255 motion,

and transferred the matter to the Court of Appeals.  (Dkt. No. 139).  On

November 1, 2017, Webster filed a Notice of Appeal. (Dkt. No. 141).

12.   On November 21, 2017, the Court of Appeals concluded that Webster's

application made a prima facia showing as the a proposed claim under

*Giglio v. United States*, 405 U.S. 150 (1972), and ordered the application

transferred to the District Court to be processed as a §2255 motion.  (Dkt.

No. 143).

13.   On November 27, 2017, this Court  ordered the appointment of counsel.

(Dkt. No. 145).   The undersigned appeared on November 29, 2017.  (Dkt.

No. 146).

14.   Through counsel, Webster files this Amended  Motion to Vacate, Set Aside,

or Correct a Sentence by a Person in Federal Custody under 28 U.S.C. §

2255.

15. Briefly, this Amended Motion incorporates Webster's claims relating to *Brady/Giglio* violations by the Government.

## ARGUMENT

### *I. Brady, Giglio Claims*

16. Title 28 U.S.C. § 2242 provides an application for a writ of habeas corpus "may be amended or supplemented as provided in the rules of procedure applicable to civil actions." Fed. R. Civ. P. 15(a) allows a party to "amend its pleading once as a matter of course within: (A) 21 days after serving it, or (B) if the pleading is one to which a responsive pleading is required, 21 days after service of the responsive pleading . . . ."

17. At the trial, the Government was represented by James Seykora. Mr. Seykora also represented the Government in *United States v. LaShawn Johnson*, CR 06-79-BLG-DLC[1], *United States v. Garcia*, CR-04-87-BLG-RFC, and *United States v. Fritz Anderson*, CR 07-15-BLG-SPW.[2]

18. In *United States v. LaShawn Johnson*, the Court found that Mr. Seykora had failed to fully disclose Government's witnesses' cooperation with

---

[1]Formerly CR 06-79-BLG-RFC

[2]Formerly CR 07-15-BLG-RFC

authorities to defense counsel. (*Johnson*, CR 06-79-BLG-DLC, Dkt. No.

193).  As a result, the Court vacated Johnson's conviction and ordered a

new trial.  Prior to the new trial, the Government moved to dismiss the

Indictment against Johnson with prejudice.  (*Johnson*, CR 06-79-BLG-

DLC, Dkt. No. 201).

19.  In *United States v. Garcia*, the Court found Mr.Seykora had failed to correct

false testimony about an immunity agreement and failed to demonstrate an

understanding of the immunity agreement.

20.  Finally, in *United States v. Fritz Anderson*, the Court issued an order

directing the Government to "review all information within its control and

the investigation and prosecution of Anderson's case and about the

witnesses presented at Anderson's trial to determine whether it is in full

compliance with its obligations under *Brady* and *Giglio*."  *Anderson*, CR-

07-15-BLG-SPW, Dkt. No. 453, pg. 17).  Subsequently, this Court entered

an Order concluding that the United States withheld crucial information

about benefits it gave to dozens of witnesses and vacated the convictions on

27 of 30 counts.  (*Id.*, Dkt. No. 506).

21.  Webster's case has similarities to those in *Johnson, Garcia,* and *Anderson*,

in that Mr. Seykora called a number of cooperating witnesses to testify

against Webster.

22.  At the onset of trial, the Government called Billings Police Department

undercover officer Mike Gilluly to explain how individuals are

"develop[ed]" as a source of information.  (Trial Trans. Vol. I, pg. 174; Dkt.

No. 108).  Officer Gilluly testified that Leclair was being investigated for

another crime at the time, and at that time, Leclair mentioned that he had

some information about drug activity.  (Id.).   Thereafter, Leclair agreed to

assist with confidential informant buys.  (Id.).

23.  Significantly, no further information regarding the circumstances of

Gilluly's initial contact with Leclair, and whether/what criminal charges

Leclair faced had he not volunteered to assist law enforcement.  The

Government did not provide defense counsel with law enforcement reports

or in-car audio evidence  regarding law enforcement's contact with Leclair.

24.  Officer Gilluly testified that over the course of several months, Leclair and

Gilluly were able to purchase methamphetamine from Richard Todd, Sam

Ireland, Marcos Quinones and Dana Shearer.  (Trial Trans. Vol. I,  pg. 175).

25.  Agent Diane Jenkins of the Drug Enforcement Administration testified that

she assisted with the investigation of the drug conspiracy and hoped to

develop information of the source of the methamphetamine being sold in

Billings, Montana.  (Trial Trans. Vol. I,  pg. 184).    As part of the

investigation, she identified a stash house where Richard Todd and Sam

Ireland were storing methamphetamine.  (Id.).  The house belonged to Tom

Long.  (Id.).  Agent Jenkins identified photographs of individuals entering

the house, including Long, Richard Todd, Sam Ireland and others.  (Id.).

26.    In May, 2005, Richard Todd was arrested.  At the time of Richard Todd's

arrest, a phone was seized.  (Trial Trans. Vol. I, pg.  188).  Within the

contact list was an entry by the name of  L.  (Trial Trans. Vol. I, pg. 191).

The number was subsequently identified as that used by Lamar Webster.

27.    Casey Ryan Dayley testified that he started working for Richard Todd in

March, 2004. (Trial Trans. Vol. I, pg. 246).   Dayley testified that Todd

telephoned him to meet at the Billings Hotel and when he went to that

location, he met Todd,  L. and Garry Ireland.  (Trial Trans. Vol. I, pg. 247).

Dayley testified that at that meeting, Todd asked him to hold

methamphetamine at his house in exchange for a fee of $500.00 per week.

(Trial Trans. Vol. I, pg. 248).  Dayley testified that he only met L. on the

one occasion.  (Trial Trans. Vol. I, pg. 253).  Further, when he visited

California, he did not see L. , but rather, visited Todd's house and packaged

methamphetamine into a tire.  (Trial Trans. Vol. I, pgs. 254, 261).

28.   Dayley testified that he was not charged in connection with his role in the

conspiracy.  Rather, Dayley was allowed to forfeit the amount of equity in

his house – $8,000.00.  (Trial Trans. Vol. I, pg. 255).   While the immunity

agreement was provided in discovery, no further information regarding the

negotiations leading to the very favorable resolution were provided.  There

are no emails, agent notes, nor attorney summaries addressing how Dayley

was able to "buy" his way out of a conspiracy charge.

29.   On cross-examination, counsel questioned Dayley regarding his

identification of Webster.  Dayley testified that he was shown the photo

line-up only a week prior to the trial.  (Trial Trans. Vol. I, pg. 265).

30.   The Government introduced a number of Western Union wire transactions.

(Trial Trans., Vol. II, pg. 287, Dkt. No. 110).   Of the multiple exhibits

introduced over objection, only one Western Union transaction, exhibit

14A, related to Webster: a $300.00 transfer.  (Trial Trans., Vol. II, pg. 304).

The sender was Kelly Mayes and the receiver was Lamar Webster.  (Id.).

The Western Union representative testified that, given the amount of the

transaction, no form of identification was required for receipt.  (Id.).

31.   Richard Todd testified against Webster on behalf of the Government, and

his testimony was devastating to Webster's case.  Todd testified that he met

Webster through his sister and brother-in-law in May-June, 2003.  (Trial

Trans., Vol. II pg. 324).  Todd testified that Webster became his source of

methamphetamine, beginning with a three ounce purchase.  (Trial Trans.,

Vol. II, pg. 328).   At the time of the initial purchase, Todd testified that he

did not know Webster's real name and only learned his name when he was

asked to send him a $300.00 Western Union.  (Trial Trans., Vol. II, pg.

330).  Todd testified that the money sent to Webster derived from drug

proceeds – the drugs that Webster had given Todd to sell in Billings.  (Trial

Trans., Vol. II, pg. 422).

32.    Todd testified that he continued to receive methamphetamine from Webster

which primarily was transported by car from California to Montana.  (Trial

Trans., Vol. II, pg. 336).  Todd testified that Webster supplied him with

larger quantities of methamphetamine, up to  pound quantities.  (Trial Trans.

Vol. II, pg. 358).  Todd stated that he distributed methamphetamine

provided by Webster through various distributors, including Quinones,

Leclair, Zarzoza and Sam and Garry Ireland.  Todd testified that he

continued to obtain methamphetamine from Webster until approximately

August, 2004.  (Trial Trans., Vol. II, pg. 403).

33.    On direct examination, Todd testified regarding his decision to cooperate

with the Government, stating "I didn't want to cooperate.  I – when you're in the life of drugs and selling drugs and – I'm a third generation drug dealer.  Drugs has ruined my family for three generations.  It killed my dad, and took me from my son." (Trial Trans., Vol. II, pg. 423).  Thereafter, Todd stated that once he saw his discovery, he "had to cooperate." (Trial Trans., Vol. II, pg. 424).

34.   Todd acknowledged that he had an agreement with the United States regarding his cooperation, but stated: "I haven't been promised anything.  I've been locked up three and a half years, and I still got 22 years." (Id.)

35.   On cross-examination, counsel questioned Todd about conversations with his wife, co-conspirator Kelly Mayes.  Todd acknowledged that within days of his arrest, he sought immunity for himself, Kelly and his father, in exchange for information. (Trial Trans., Vol. II, pgs. 432, 435, 444).

36.   Counsel continued to question Todd regarding cooperation and a reduction in sentence.  Todd repeated that he was "not promised anything.  That it was a possible – yes, it was written that it was a possibility that a motion could be filed because of my cooperation." (Trial Trans., Vol. II, pgs. 456-57).  Todd denied that he had told a co-defendant that he was going to get 60 percent off his sentence for his cooperation.  (Trial Trans., Vol. II, pg. 459).

37.    At the time of his testimony, Todd had already been sentenced in connection

with his federal conviction on the charge of Conspiracy to Possess with

Intent to Distribute or Distribute. (*U.S. v. Todd*, CR 05-73-BLG-RFC-01).

On October 20, 2006, Todd had been sentenced to a term of 264 months, to

be followed by 4 years of supervised release.  Absent a review of sealed

statements given during sentencing, Webster can only speculate on the

comments made by the Government regarding continued cooperation and

benefits for future testimony.   However, it is apparent that Todd received

substantial benefits.  Despite his trial testimony that he had been "locked up

three and a half years, and I still got 22 years[,]" (Trial Trans., Vol. II, pg.

424), the public docket reflects an in chambers conference as to Todd on

April 16, 2009, coincidentally the day before Webster's sentencing.

(Exhibit A, Dkt. No. 184).  While there is not a disposition noted,

nonetheless, it is apparent that Mr. Todd was given an *enormous* reduction

for his critical testimony.   According to the Bureau of Prisons website,

Todd was released on December 19, 2014, a mere six years after his trial

testimony.  Based on his trial testimony, the difference in the release date

versus the total imposed sentence, and the prior cases in which Mr. Seykora

was involved, Webster asserts that the Government violated his right to due

process by withholding additional *Brady/Giglio* material regarding the

benefits Todd would receive for his testimony against him.

38.   The Government paraded a litany of co-conspirators before the jury to

testify against Webster.  Brandon Leclair testified that he reconnected with

Richard Todd in the fall of 2003 with a proposal that Leclair start selling

drugs for him.  (Trial Trans., Vol. II, pg. 478).  Leclair testified that he had

been selling methamphetamine for Todd, not only to make money, but also

to support a bad habit. (Trial Trans., Vol. II, pg. 481).  Leclair testified that

by 2004, he was selling larger quantities of methamphetamine for Todd.

Leclair testified to one occasion in June, 2004 when he traveled to

California to meet with Todd and pick up six pounds of methamphetamine,

which was subsequently broken up into pound packages in Todd's garage.

(Trial Trans., Vol. II, pgs. 485-487).  Leclair testified that the

methamphetamine was transported to Montana in a car tire and that Webster

showed up while he was filling the tire with air.  (Trial Trans., Vol. II, pg.

488).   Leclair further testified that Todd told him that Webster was his

source.  (Trial Trans., Vol. II, pg. 492).  Leclair testified that he saw

Webster in Billings with Todd and Garry Ireland when he went to pick up

methamphetamine from Todd, and spent time with Webster driving around

at stash houses.  (Trial Trans., Vol. II, pgs. 494, 495).

39.    On cross examination, Leclair admitted that he never saw Webster with

        either drugs or money and that it was only Richard Todd who reported that

        Webster was his partner.  (Trial Trans., Vol. II, pg. 500).  Additionally,

        Leclair confirmed that he had written several letters to the prosecutor, James

        Seykora, stating that he did not know a Lamar Webster and did not wish to

        testify.  (Id.)   When questioned about the discrepancy with his trial

        testimony, Leclair testified that he knew Webster as "L".  (Trial Trans., Vol.

        II, pg. 501).

40.    Leclair further testified that he was a paid informant for his cooperation and

        had received approximately $5,000.00 over the period of six or seven

        months for his cooperation.  (Id.).

41.    Significantly, Leclair was not charged in the current conspiracy, despite his

        role as one of Todd's main distributors.  Unlike other Government

        witnesses, Leclair's cooperation provided him with complete immunity.

        There exists no plea agreements nor 5K1.1 motion, nor an immunity letter.

        (Trial Trans., Vol. II, pg. 505).   No information was disclosed regarding the

        intelligence developed against Leclair – what the Government had on

        Leclair,  nor the manner in which agents "developed"  Leclair as a source of

-14-

information.   Defense counsel was not privy to communications between

Mr. Seykora, agents and Leclair.   There are no agent notes nor internal

memos to document the communications.   Leclair was incarcerated for a

charge "unrelated to this case."  (Trial Trans., Vol. II, pg. 505).  (Exhibit B).

42.   Garry Ireland was the next cooperating witness called by the Government.

Garry Ireland testified that he and his brother Sam had become friends with

Richard Todd beginning in approximately 1999-2000.  (Trial Trans., Vol. II,

pg. 507).   Garry testified that in late 2003, early 2004, Richard Todd

contacted him with the proposition that Garry sell methamphetamine for

him in Florida.  (Trial Trans., Vol. II, pg. 509). After selling Todd's half

pound, Garry flew with Todd back to California where he was introduced to

Webster.  (Trial Trans., Vol. II, pg. 512).   Garry testified that when he met

Webster, he did not engage in any conversation about drugs, but "I kind of

figured things out."  (Trial Trans., Vol. II, pg. 514).   Garry testified that

three days later, he and Todd picked up 2 and ½ pounds of

methamphetamine from Webster.  (Id.).

43.   Garry Ireland testified that his agreement with Todd was to carry the

methamphetamine, and he would receive $100.00 an ounce when they –

Garry, Todd and Webster –  drove back to Montana.  (Trial Trans., Vol. II,

pgs. 517-518).  Garry testified that upon arriving in Montana, they took the

methamphetamine to Casey Dayley's house and unloaded the drugs.  (Trial

Trans., Vol. II, pg. 520).  Garry testified that he did not sell the drug, but

rather, that he "toted" it when Todd delivered it to his people.  (Trial Trans.,

Vol. II, pg. 522).  Garry testified that he saw three pounds of meth, and

approximately $38,000 to $40,000.00.  (Trial Trans., Vol. II, pg. 523).

Garry stated that he and Todd carried the money on their person back down

to California.  (Trial Trans., Vol. II, pg. 525).

44.    Garry also testified to an argument between Todd and Leclair where Todd

alleged Leclair owed money for drugs.  (Trial Trans., Vol. II, pg. 528).

Garry stated that Webster was present during the argument about the money.

(Trial Trans., Vol. II, pg. 529).

45.    On cross examination, Garry Ireland confirmed that he was first interviewed

by law enforcement a mere week and a half before trial.  (Trial Trans., Vol.

II, pg. 530).  Garry acknowledged that in an earlier interview via phone, he

denied that any drugs were being transported or any knowledge of a

confrontation between Todd and Leclair over money.  (Trial Trans., Vol. II,

pgs. 533, 535).

46.    The Government briefly touched on the fact that Garry Ireland was in state

custody in Florida.  (Trial Trans., Vol. II, pg. 506).   Despite his active

involvement in the distribution of nearly three pounds of

methamphetamine, Garry Ireland was not charged in the conspiracy.  Much

like the prior cooperating witness Leclair, there exists no plea agreements,

5K1.1 motion, nor an immunity letter.  Defense counsel was not privy to

communications between Mr. Seykora, agents and Garry Ireland and there

are no agent notes nor internal memos to document the communications that

occurred in the ten days leading up to trial when Garry decided to cooperate.

Garry Ireland had stated that he "didn't think I was going to get picked up

on this."   (Trial Trans., Vol. II, pg. 531).  It was only after he was brought

to Montana from Florida, in custody and on the eve of trial, that he agreed

to give information.

47.   Sam Ireland was the next cooperating witness.  He stated that when he

initially agreed to help Richard Todd distribute methamphetamine, he went

to California to meet with Todd.  On that trip, he and Todd went to

Webster's house to pick up one pound of methamphetamine.  That

methamphetamine was packed into a tire for transportation back to

Montana.  (Trial Trans., Vol. II, pgs. 547-49).

48.   Sam Ireland testified that his role in Richard Todd's drug distribution was to

"fill in for [Todd] while he was gone out of Montana" and sell drugs,

deliver and pick up money, and be paid about $10,000.00/month.  (Trial

Trans., Vol. II, pg. 545).  Sam Ireland was informed about the location of

the stash house, where the drugs and money were held, had a combination to

the safe, and met all of the people that Todd had set up for distribution, as

well as the prices and quantities to give to each individual.  (Trial Trans.,

Vol. II, pgs. 551-553).

49.     Sam Ireland testified that he was currently in federal custody, having been

convicted of the drug conspiracy involving Richard Todd, and had signed a

plea agreement where he agreed to cooperate.  (Trial Trans., Vol. II, pg.

542).  (*U.S. v. Ireland*, CR 05-111-BLG-RFC).   On September 7, 2006,

Sam Ireland had been sentenced to a term of 168 months, to be followed by

4 years of supervised release. On cross-examination, Sam was questioned

regarding his expectations under the plea agreement.  And with previous

cooperating witnesses, Ireland testified repeatedly "there's no promises."

(Trial Trans., Vol. II, pg. 560).

50.     Absent a review of sealed statements given during sentencing, Webster can

only speculate on the relevant guidelines and the comments made by the

Government regarding continued cooperation and benefits for future

testimony.   However, it is apparent that Sam Ireland also received

substantial benefits, but only after he testified in Webster's trial.  The public

docket reflects an in chambers conference as to Sam Ireland on April 16,

2009, coincidentally the day before Webster's sentencing and the same day

as Richard Todd's Rule 35 in chambers conference.  (Exhibit C, Dkt. No.

40).  While there is not a disposition noted, nonetheless, it is apparent that

Ireland was given an *substantial* reduction for his critical testimony.

According to the Bureau of Prisons website, Sam Ireland  was released from

BOP custody on August 29, 2011, approximately three  years after his trial

testimony.  Based on his trial testimony, the difference in the release date

versus the total imposed sentence, and the prior cases in which Mr. Seykora

was involved, Webster asserts that the Government violated his right to due

process by withholding additional *Brady/Giglio* material regarding the

benefits Sam Ireland would receive for his testimony against him.

51.   The Government also called Tim Bayes to testify.  (Trial Trans. Vol. III, pg.

580; Dkt. No. 111).  Bayes  testified that he was currently in federal

custody, and had signed a plea agreement where he agreed to cooperate.

(Trial Trans. Vol. III, pg. 581).   Bayes testified that he supplied

methamphetamine to Richard Todd from August, 2004 through May, 2005.

(Trial Trans. Vol. III, pg. 584).

52.    Beyond the testimony that Bayes had signed a plea agreement and agreed to

cooperate, there was no further discussion regarding promises of a sentence

reduction.  Nonetheless, Bayes did receive a benefit from his cooperation.

On September 20, 2007, Bayes had been sentenced to 90 months, to be

followed by a five year term of supervised release for his role in the

conspiracy.  (*U.S. v.Bayes*, CR 06-90-BLG-RFC-02).  The public docket

reflects an in chambers conference as to Bayes on March 18, 2009.  (Exhibit

D, Dkt. No.130).  While there is not a disposition noted, nonetheless, it is

apparent that Bayes received a reduction for his testimony.   According to

the Bureau of Prisons website, Bayes was released from BOP custody on

February 25, 2011.

53.    Kelly Mayes, the wife of Richard Todd,  was the next cooperating witness

to testify.  (Trial Trans. Vol. III, pg. 610).  Mayes testified that she

transported smaller quantities of methamphetamine to Billings, Montana,

and accumulated the monies generated from the sales.  Mayes testified that

at one point, she had accumulated $80,000.00 in the closet of their

Brentwood, California home.  (Trial Trans. Vol. III, pg. 617).  She further

testified that on one occasion she traveled to Billings where Chris Zarzoza

delivered $40,000.00 to her hotel. (Trial Trans. Vol. III, pg. 619).

54.   When questioned how she learned of a business relationship between

Webster and Todd, Mayes testified that Todd mentioned it. (Id.). Mayes

testified that she was directed by Todd to deliver $16,000.00 to Webster.

(Trial Trans. Vol. III, pg. 622).   On cross-examination, Mayes clarified that

she did not deliver the money to Webster, but rather, directed Todd's father,

Roger Todd, to deliver the money. (Trial Trans. Vol. III, pg. 637-38).   Nor

was Mayes informed what the money was for. (Id.). Mayes testified that on

only one occasion did she send Webster money via Western Union, in the

amount of $300.00, at the direction of Todd, and with no further

information what the money was for. (Trial Trans. Vol. III, pg. 641).

55.   On cross-examination, Mayes was questioned about earlier statements

where she had denied any knowledge in the sale of drugs. (Trial Trans. Vol.

III, pg. 634).   Mayes further acknowledged that the only information she

had about Webster was what Todd had told her, and that she had never seen

Webster give Todd any drugs, nor Todd give Webster any money. (Trial

Trans. Vol. III, pg. 635).   She further testified that she had never seen

Webster in Montana. (Trial Trans. Vol. III, pg. 637).

56.   Mayes testified that she was currently in federal custody, having been

convicted of the drug conspiracy involving Richard Todd, and had signed a

plea agreement where she agreed to cooperate.  (Trial Trans., Vol. III, pg.

630).  (*U.S. v. Mayes*, CR 06-90-BLG-RFC-01).   On October 17, 2007,

Mayes had been sentenced to a term of 96 months, to be followed by 5 years

of supervised release. On cross-examination, Mayes was questioned

regarding her expectations under the plea agreement.  And with previous

cooperating witnesses, Mayes testified repeatedly there were "no promises."

  (Trial Trans., Vol. III, pg. 642).   Mayes acknowledged that she signed a

Use Immunity Agreement with the Government, protecting her from

prosecution from anything revealed in her debriefing.  (Trial Trans. Vol. III,

pg. 644).

57.   Mayes entered her guilty plea on July 5, 2007 and was thereafter placed into

custody.  (Exhibit E, Dkt. No. 85).  Mayes was sentenced on October 17,

2007 to a term of custody of 96 months.  (Id., Dkt. No. 114).  Absent a

review of sealed statements given during sentencing, Webster can only

speculate on the relevant guidelines and the comments made by the

Government regarding continued cooperation and benefits for future

testimony.   However, it is apparent that Mayes received substantial benefits

after she testified in Webster's trial.  The public docket reflects an in

chambers conference as to Mayes on January 6, 2009.  (Id., Dkt.  No. 126).

While there is not a disposition noted, nonetheless, it is apparent that Mayes

was given an *substantial* reduction for her testimony.   According to the

Bureau of Prisons website, Mayes was released from BOP custody on

November 18, 2011,  approximately three  years after her trial testimony.

Based on her trial testimony, the difference in the release date versus the

total imposed sentence, and the prior cases in which Mr. Seykora was

involved, Webster asserts that the Government violated his right to due

process by withholding additional *Brady/Giglio* material regarding the

benefits Mayes would receive for her testimony against him.

58.   Marcus Quinones was then next cooperating witness to testify.  (Trial

Trans., Vol. III, pg. 670).   Quinones testified that he was in federal custody,

having pleaded guilty to a federal drug conspiracy.  (Trial Trans., Vol. III,

pg. 671).   Thereafter, Quinones summarized his drug habit, his contact with

Richard Todd's drug distribution network, and the manner in which Todd

arranged to have the methamphetamine transported from California to

Montana in the rim of a tire.  (Trial Trans., Vol. III, pgs. 672-676).  Notably,

Quinones testified that he had never seen Webster.  (Trial Trans., Vol. III,

pg. 680).

59.    At the time of his testimony, Quinones had already been sentenced in

connection with his federal conviction on the charge of Conspiracy to

Possess with Intent to Distribute or Distribute. (*U.S. v. Quinones*, CR 05-73-

BLG-RFC-02).   On February 8, 2007, Quinones was sentenced to a BOP

term of 60 months with a term of 5 years supervised release to follow.   It

appears Quinones received all the benefits of his cooperation well before he

testified against Webster.  Webster was not provided a presentence report

nor the Government's 5K1.1 motion.    Nonetheless, the public docket

provides that Court granted a 5K1 motion at the time of sentencing. (Exhibit

F, Dkt. No. 161).    Again, absent a review of sealed statements given during

sentencing, Webster can only speculate on the comments made by the

Government regarding continued cooperation and benefits for future

testimony.

60.    A review of the transcripts in this case demonstrates that, at minimum, a

number of the Government's cooperating witnesses were less than

forthcoming about the benefits they had either been all-but-promised, or had

already received, in exchange for their testimony.

61.    The evidence against Webster consisted almost entirely of cooperating

witnesses who had received benefits from the Government.  The

Government's proof against Webster consisted of an alleged conspiracy, with historical drug amounts, and a $300.00 Western Union wire.  No drugs, no money, no receipts, no telephone records, or tangible, physical evidence was introduced at trial.  In short, the trial turned on questions of credibility. Defense counsel showed the jury that these witnesses had received some benefit, however, he was limited by the information available to him by his own investigation and disclosed by the Government.

62.  Because Webster's trial largely turned on the credibility of cooperating witnesses, the benefits and promises they received in exchange for their testimony was (and is) favorable to Webster's case.

63.  The evidence withheld by the Government is material as defined in *United States v. Lopez*, 577 F.3d 1053 (9th Cir. 2009).  "Evidence is material when there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *Lopez*, 577 F.3d at 1059 (citing and quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)).

64.  "A 'reasonable probability' of a different result exists when the government's evidentiary suppression undermines confidence in the outcome of the trial.'"  *Id.* (quoting *Kyles v. Whitley*, 514 U.S. 419, 434

-25-

(1995)).  "The question is not whether the defendant would more likely than

not have received a different verdict."  *Kyles*, 514 U.S. at 434.  Nor will it

be adequate to show that "after discounting the inculpatory evidence in light

of the undisclosed evidence," the remaining evidence was sufficient to

support a conviction.  *Id.* at 434-35.  The question is "whether the

prosecutor interfered with the jury's ability to assess the witnesses'

credibility.  There is no justification for deferring to the jury's verdict if the

jury was deprived of important information that might have led it to a

different verdict."  *Anderson,* supra, CR 07-05-BLG-SPW, Dkt. No. 506,

pg. 19.  The test is whether there is a reasonable juror, exposed to all the

trial evidence plus the previously undisclosed evidence, would, to a

reasonable probability, have retained reasonable doubt as the Webster's

guilt on one or more counts, or as to an elemental drug quantity.  *Id.*, See,

*Turner v. United States*, ___ U.S. ___, 137 S.Ct. 1885, 1893 (2017); Cone

v. Bell, 556 U.S. 449, 470 (2009).  *See generally Kyles*, 514 U.S. at 441-54;

Order (Doc. 193) *United States v. Johnson*, CR 06-79-BLG-DLC (D. Mont.

Dec. 1, 2014).

65.   In *Napue v. Illinois*, 360 U.S. 264, 79 S. Ct. 11173 (1959), an important

government witness falsely testified that he had received no promise of

-26-

consideration in return for his testimony and the prosecutor did nothing to correct that false testimony.  The United States Supreme Court held that, as a result, the petitioner was denied due process in violation of the Fourteenth Amendment to the U.S. Constitution – even thought the jury was apprised of other grounds for believing the witness may have had an interest in testifying against the petitioner.  In so holding, the Court stated:

> First, it is established that such a conviction obtained through use of false evidence, known to be such by representatives of the State must fall under the Fourteenth Amendment . . . . The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears.
>
> * * * * *
>
> The principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to exist because the false testimony goes only to the credibility of the witness.  The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend.

*Id.* 360 U.S. at 269, 79 S. Ct. at 1178.

66.    The Court cited and quoted *People v. Savvides*, 136 N.2d 853, 854-55.

> It is of no consequence that the falsehood borne upon the
> witness' credibility rather than directly upon defendant's
> guilt.  A lie is a lie, no matter what its subject, and, if it is
> in any way relevant to the case, the district attorney has
> the responsibility and duty to correct what he knew to be
> false and elicit the truth. . .That the district attorney's
> silence was not the result of guile or a desire to prejudice
> matters little, for its impact was the same, preventing, as
> it did, a trial that could in any real sense be termed fair.

67.    The *Napue* Court went on to hold that the fact the jury was apprised of other

grounds for believing the witness may have had an interest in testifying

against the petitioner did not turn a tainted trial into a fair one.  It

additionally noted that the prosecutor asked the witness:  "Has [the judge]

promised you any reduction?" and "Have I promised you that I would

recommend any reduction of sentence to anybody?"  The prosecutor knew

that the negative responses were false.

68.    Similarly, in *United States v. LaPage*, 231 F.3d 488 (9th Cir. 2000), the

Ninth Circuit Court of Appeals held that a prosecutor's knowing use of a

witness' false testimony constituted a due process violation.  This was so

even though, in his rebuttal closing, the prosecutor conceded that the

witness lied.  In reversing the conviction the Court noted that:

> The prosecutor did nothing to correct the false
> impression of the facts left with the jury.  Defense
> counsel ineffectually attempted to impeach Manes.  The
> prosecutor attempted to bolster Mane's credibility in his
> closing argument in chief by arguing that Manes was a
> credible witness.  Finally, in his rebuttal closing
> argument the prosecutor conceded that Manes had lied.

> *Id.* at 490-91.

69.   The Ninth Circuit Court of Appeals went on to hold:

> But the government's duty to correct perjury by its
> witnesses is not discharged merely because defense
> counsel knows, and the jury may have figured out, that
> the testimony is false.  Where the prosecutor knows that
> his witness lied, he has a constitutional duty to correct
> the false impression of the facts.

> *Id.* at 492.

70.   In Webster's case, several witnesses appear to have been rewarded with

additional  Rule 35 reductions before their testimony against Webster while

others benefitted immediately thereafter.

## CONCLUSION

Webster's conviction came on the back of cooperating witnesses whose

testimony regarding the benefits they received from the Government consisted of

lies and half-truths.  Additionally, there is sufficient evidence to suspect Mr.

-29-

Seykora engaged in a number of *Brady* and *Giglio* violations.  Webster respectfully requests this Court **GRANT** his amended petition to Vacate, Set Aside, or Correct the Sentence under 28 U.S.C. § 2255 and his conviction overturned.

In the alternative, he requests the Court order the Government to respond to this Amended Petition and address the materiality of omissions and misstatements made by its witnesses at trial.

Webster also requests the Court direct the Government to review all information within its control about the investigation of Webster's case and about the witnesses presented at Webster's trial to determine whether it is in full compliance with its obligations under *Brady* and *Giglio*.  From a review of the Government's files provided to Webster, there appear to be investigative materials not formally memorialized in reports, but rather, referenced in inner office correspondence with legal assistants and law enforcement agents.  Emails were noted in the file which indicate that information was discussed with Mr. Seykora involving key prosecution witnesses, information which would go to the credibility of witness' testimony, as well as a notation by an agent that a witness could "exculpate Mr. Webster."  In this regard, Webster seeks inter-office communications with the U.S. Attorney's office, to include additional support

personnel and clerical assistants utilized in the prosecution of Webster's case, as well as electronic communication between agents and Mr. Seykora and his staff. Webster seeks logs of telephone calls, email, internal reports, communication between the AUSA and witnesses/attorney for the witness, and agent notes of all witness interviews.    Webster requests an opportunity to conduct further discovery pursuant to Rule 6 and the record be expanded pursuant to Rule 7 of the Rules Governing Section 2255 Proceedings for the United States District Courts. Thereafter, if necessary, counsel requests the opportunity to file either an Amended Motion or additional briefing incorporating the information discovered in those processes.

 RESPECTFULLY SUBMITTED this 17th  day of July, 2019.

    /s/ Lisa J. Bazant

   Lisa J. Bazant
   Attorney for Defendant/Movant

## CERTIFICATE OF COMPLIANCE

I, Lisa J. Bazant, do hereby certify that this Brief in Support of Amended Motion to Vacate, Set Aside, or Correct a Sentence By a Person in Federal Custody under 28 U.S.C. § 2255, complies with L.R. 7.1(a).  Further, pursuant to Local Rule, the body of the petition contains 6253 words, excluding the caption and certificate of compliance.

Submitted this 17th day of July, 2019.


 /s/ Lisa J. Bazant_____
Lisa J. Bazant
Attorney for Defendant/Movant

## CERTIFICATE OF SERVICE

I, Lisa J. Bazant, do hereby certify that I delivered a true and correct copy of

this Brief in Support of Amended Motion to Vacate, Set Aside, or Correct a

Sentence By a Person in Federal Custody under 28 U.S.C. § 2255 to the following

individuals via the means indicated below.

CMECF:

Jared Cobell
Assistant United States Attorney
Great Falls, MT 59101

US Mail:

Lamar Webster
USP Lompoc

Dated this 17th day of July, 2019.


 /s/ Lisa J. Bazant
Lisa J. Bazant
Attorney for Defendant/Movant