IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff/Respondent,<br><br>vs.<br><br>LAMAR WEBSTER,<br><br>Defendant/Movant. | Cause No. CR 07-128-BLG-SPW<br><br>ORDER |

On November 21, 2017, the Court of Appeals granted Webster leave to file a second motion under 28 U.S.C. § 2255 in this Court. *See* Order (Doc. 143-2). On November 27, the Court ordered new counsel to be appointed to represent Webster. *See* Order (Doc. 145). On July 17, 2019, counsel Lisa Bazant filed an amended motion (Doc. 169). The United States responded on May 21, 2020 (Doc. 184).

On September 11, 2020, at Webster's request, counsel moved to withdraw from representation. *See* Mot. to Withdraw (Doc. 205). The motion was granted, and Webster was granted leave, and later two extensions of time, to file a reply pro se. *See* Orders (Docs. 206, 208, 210). He did not do so, but a reply is optional.

In the amended motion, Webster's counsel requested an opportunity to conduct discovery. Before considering that option, the Court wants a clearer

1

documentary record.

## I. The State of the Record

The United States helpfully describes the extent of its investigation in response to Webster's motion. *See* U.S. Resp. (Doc. 184) at 11–12 & n.2. Its limitations on its investigation are less helpful.

As the Court understands it, four locations or types of files are relevant.

### A. Webster's File

The United States reports that both it and Webster's counsel reviewed the United States' file on Webster's case, which "include[s] discovery, filings . . . trial materials, and correspondence." U.S. Resp. at 11. It is not clear when Webster's counsel was permitted to review the file.

In its Webster file, the United States found an immunity letter for Garry Ireland dated December 2, 2008. *See id.* at 23; G. Ireland Letter (Doc. 184-2 at 13). Webster's habeas counsel did not mention an immunity letter in her amended motion. *See* Am. § 2255 Mot. (Doc. 169) at 17 ¶ 46. The reason for this discrepancy between the amended motion and what the United States says counsel reviewed is not clear.[1] It is also not clear whether some or all of the contents of

---

[1] The United States asserts that "Webster's trial counsel and the jury both knew" about Garry Ireland's immunity "before he took the stand," U.S. Resp. (Doc. 184) at 44, because Seykora said in opening statement that Garry Ireland had "been given an immunity letter" and had not "been charged federally." 1 Trial Tr. (Doc. 108) at 167:15–16.
    Statements by lawyers are not evidence. No one elicited evidence of Garry Ireland's

2

this file were disclosed to Webster's trial counsel.

## B. Court Dockets of Cooperating Witnesses

The United States also searched "separate federal cases of some of the cooperating witnesses." *Id.* at 11. By "separate federal cases," the United States means the cooperators' court dockets. The Court believes the United States says "some" of the cooperators because two witnesses were not charged with any crimes in this District and therefore do not have "separate federal cases."

Before Webster's trial, Seykora filed three sentence reduction motions for two of his cooperating witnesses. Consistent with standard practice, these motions were filed under seal, that is, with both the docket entries and the documents themselves withheld from the public record. *See* U.S. § 5K1.1 Mot. (Doc. 160), *United States v. Quinones*, No. CR 05-73-BLG-RFC (D. Mont. Feb. 8, 2007); U.S. § 5K1.1 Mot. (Doc. 112), *United States v. Mayes*, No. CR 06-90-BLG-RFC (D. Mont. Oct. 15, 2007); U.S. Rule 35 Mot. (Doc. 124), *Mayes*, No. CR 06-90 (D. Mont. Oct. 14, 2008) (all under seal).

The United States does not say whether it located the three sealed motions Seykora filed for Mayes and Quinones in Webster's file or only in the "separate

---

immunity or incentives for his testimony. Therefore, the jury was not permitted to consider Seykora's opening statement in weighing Garry Ireland's credibility. *See* Jury Instrs. Nos. 5, 6 (Doc. 78 at 6, 7). In addition, a reference in opening statement does not meet a prosecutor's disclosure obligations.

federal cases" of Mayes and Quinones. Both the United States and Webster's habeas counsel reviewed Webster's file, *see* U.S. Resp. at 11, and yet the amended § 2255 motion does not indicate that Webster was aware of Mayes' two motions or reviewed the § 5K1.1 motion filed for Quinones, *see* Am. Mot. (Doc. 169) at 22–23 ¶ 57; *see also id.* at 24 ¶ 59 (citing public docket entry in Quinones' sentencing).

C. **Files on Cooperating Witnesses**

The United States did *not* review the "separate physical case files involving cooperating witnesses who were charged in this district." U.S. Resp. at 12 n.2. The witnesses "charged in this district" were Todd, LeClair, Sam Ireland (Garry's brother), Bayes, Zarzoza, Mayes, and Quinones.

Presumably, these files would include discovery produced to the witnesses' own counsel, such as 302s, recordings and other potential trial evidence, as well as correspondence or memoranda concerning benefits the government was capable of conferring on the witnesses, such as immunity letters, non-prosecution agreements, payments, or other evidence similar to that which Seykora failed to disclose in other cases.

D. **Files on Witnesses Not Charged in the District of Montana**

As to Casey Dayley and Garry Ireland, the two witnesses who were not charged in Montana, the United States apparently did not investigate whether it

might have given them undisclosed incentives or failed to disclose other impeachment information about them. *See* U.S. Resp. at 11–12 & n.2.

### E. Conclusion

The United States has reviewed two of the four possible locations or types of files. It found that Webster's file contains an immunity letter for Garry Ireland, and the dockets of two cooperating witnesses contain three sentence-reduction motions. The Court is not aware of any reason to believe Seykora disclosed these items to Webster's trial counsel.

Despite finding previously undisclosed information in both of the two places it did look, the United States has not reviewed the two locations or types of files that are arguably most likely to contain previously undisclosed information.

## II. Why Further Investigation Is Necessary

In order to prevail here, Webster must meet a very high standard of proof. He must show that the newly discovered evidence, together with all the other evidence in the case, amounts to "clear and convincing evidence that no reasonable factfinder would have found [him] guilty of the offense." 28 U.S.C. § 2255(h)(1); *see also id.* § 2244(b)(2)(B); *Brown v. Muniz*, 889 F.3d 661, 674 (9th Cir. 2018).

Realistically speaking, it is very unlikely that Webster will be able to meet this standard. That is not a sound reason to curtail the investigation or make a decision that is not fully informed. Two facts mandate an investigation equivalent

to the one that should have been done before trial to find any previously undisclosed exculpatory or impeaching evidence.

### A. The Trial Transcript Is Not Presumptively Reliable

First, in cases prosecuted by AUSA Seykora, the trial transcript is poor evidence that appropriate disclosures were made. To take just one example, the United States asserts that "there is zero evidence of undisclosed impeachment evidence" about Brandon LeClair. Answer (Doc. 184) at 43. Again, the United States has not looked in LeClair's file or whatever files other than Webster's might contain undisclosed impeachment evidence. Not looking frequently leads to zero evidence. More than that, however, the nature of LeClair's testimony provides good reason to look.

LeClair was the informant who began working with an undercover agent in December 2004 and whose actions led to Todd's indictment and arrest in May 2005. Cross-examination by Webster's trial counsel shows that the prosecution disclosed the fact that LeClair was paid for that activity. *See, e.g.*, 2 Trial Tr. (Doc. 110) at 501:10–502:2. LeClair's criminal history also was likely produced to Webster in discovery. (Cooperators' criminal histories generally are disclosed, and defense counsel are likely to notice when it is missing.) The Court will assume, for the present, that Webster's trial counsel knew LeClair already had a prior conviction for a felony drug offense at the time he was drug-trafficking with Todd.

*See United States v. LeClair*, No. CR 98-102-BLG-JDS-03 (D. Mont. judgment entered June 16, 1999).

At Webster's trial, LeClair swore under oath that he helped Todd distribute multiple pounds of methamphetamine. *See, e.g.*, 2 Trial Tr. at 483:7–484:17, 486:14–487:25. Due to his prior conviction, this quantity exposed LeClair to a potential mandatory minimum sentence of twenty years in prison. *See* 21 U.S.C. § 841(b)(1)(A)(viii) (eff. Nov. 2, 2002).

LeClair was not charged in this Court for his criminal activity with Todd. He was, however, serving a federal sentence imposed in August 2007 for a firearms offense when he testified against Webster on December 1, 2008. *See* 2 Trial Tr. (Doc. 110) at 505: 8–13; *see also* Judgment (Doc. 22), *United States v. LeClair*, No. CR 07-04-BLG-RFC (D. Mont. Aug. 10, 2007). Seykora asked LeClair to confirm that he had "been subpoenaed here to testify today," *id.* at 478:1–2, and asked him whether he had "any understanding from the government in your testimony today whether or not you will receive any favors at all or anything" or had "any understanding that some favors may be given to you." *Id.* at 499:1–7. LeClair swore under oath that he did not receive "favors" or "immunity" for his testimony. *See* 2 Trial Tr. at 499:1–8, 505:2–5. He also said he did not want to be removed from his federal prison and transported to Montana to testify against Webster, because "it makes it hard" on a prisoner to be in a local jail

instead of "stay[ing] in prison and just do[ing] your time." *See* 2 Trial Tr. (Doc. 110) at 501:3–9.

The facts set out in the previous two paragraphs do not add up. Seykora subpoenaed LeClair, who did not want to leave his spot in prison, to give self-incriminating testimony under oath, but there is no indication that LeClair was compelled to waive his Fifth Amendment privilege. *See* 18 U.S.C. § 6002(1). The privilege never came up as a subject of conversation. LeClair incriminated himself to the extent of a twenty-year mandatory minimum sentence but said he had not been given immunity.

It seems likely that LeClair had an attorney. And an attorney representing LeClair would likely want some kind of promise, whether from Seykora or someone else,[2] that LeClair would not be charged with drug offenses if he gave self-incriminating testimony under oath. This speculation is contradicted by LeClair's unequivocal trial testimony that he received no favors and no immunity—testimony Seykora did not correct or clarify. But in one previous case, Seykora failed to correct a chief witness's flat-out false trial testimony that she (and her mother) received no "promises." *See* Order (Doc. 746) at 5–6, 8–11, *United States v. Garcia*, No. CR 04-87-BLG-RFC (D. Mont. Sept. 30, 2011). And

---

[2] *See, e.g.*, Gov't Ex. 12 (Doc. 461-12) at 2 (under seal), *United States v. Anderson*, No. CR 07-15-BLG-SPW (D. Mont. June 19, 2015) (FBI memo addressed to then-United States Attorney William Mercer).

8

in another case, Seykora failed to disclose an "understanding" with multiple witnesses that they would not be prosecuted in federal court so long as they testified when the United States called them. *See* Redacted Order (Doc. 506) at 11–15, *United States v. Anderson*, No. CR 07-15-BLG-SPW (D. Mont. Oct. 9, 2018). For these reasons, the fact that LeClair testified that he received nothing in exchange for his testimony is not especially convincing evidence that he received nothing in exchange for his testimony.

Further, Webster's counsel questioned LeClair about immunity and favors without mentioning that LeClair benefitted from a Rule 35 motion in his 1998 drug case. On that occasion, his sentence was cut in half. *See* Rule 35 Mot. (Doc. 97), Order (Doc. 100), *LeClair*, No. CR 98-102-BLG-JDS-03 (D. Mont. Mar. 30 and May 10, 2000). Seykora could have filed a Rule 35 motion to reduce LeClair's 2007 firearms sentence based on his testimony against Webster in 2008. Therefore, the 1998 Rule 35 motion should have been disclosed to Webster's trial counsel, because it taught LeClair what he could hope to gain "and, realistically, could expect to gain" if his trial testimony "satisfied the prosecutor" in Webster's case. *United States v. Larson*, 495 F.3d 1094, 1110 (9th Cir. 2007) (en banc) (Graber, J., concurring). It is not clear that Webster's trial counsel knew about it.

Possibly the decision not to charge LeClair was rooted in a Fourth

Amendment violation or some other legal rationale.[3] But if the United States agreed with LeClair's counsel to forego a charge in exchange for LeClair's testimony against Todd and/or anyone else, then Webster was entitled to know that. And if LeClair remembered getting a reduced sentence under Rule 35 in his previous federal drug felony case, he might have been hoping for the same thing again after his testimony in Webster's case. Webster was entitled to know about that 1998 motion, too, so that he could decide whether to ask LeClair about it in cross-examination.

LeClair was not the most important witness against Webster. But Seykora's history makes it possible that *multiple* cooperating witnesses received or anticipated significant benefits beyond what is reflected in the trial transcript. The United States must conduct the investigation any competent, ethical Assistant United States Attorney should have conducted before Webster's trial. It cannot simply point to the trial transcript or retrace Seykora's steps.

## B. The Legal Standard Is High But Not Insurmountable

The second reason an investigation is necessary is that the Court has not yet found case law applying the high burden of proof for a second-or-successive §

---

[3] Prosecution state-side is unlikely to be the reason. He appears not to have been charged in state court either. *See* Presentence Report ¶¶ 32–45, *United States v. LeClair*, No. CR 07-04-BLG-RFC (D. Mont. judgment entered Aug. 10, 2007) (showing no convictions or arrests on drug charges around the time of Todd's conspiracy, excepting one arrest on a misdemeanor drug possession charge on Jan. 9, 2007, a year and a half after Todd's arrest in May 2015).

2255 motion in circumstances that are fairly comparable to those surrounding Seykora's cases in this Court.

Even the insufficient investigation the United States has done to date turned up significantly more compelling evidence than defendants in other cases have been able to show: three apparently undisclosed sentence-reduction motions (two for one witness) and one apparently undisclosed immunity letter, all for witnesses who directly incriminated Webster. For example, in *Brown v. Muniz*, 889 F.3d 661 (9th Cir. 2018), the defendant was convicted of the attempted murder of one Williams. His proposed second § 2255 motion relied on previously undisclosed evidence of criminal charges that had been filed and dismissed against two officers about ten years before Williams was shot. The officers participated in the investigation of the shooting but did not testify. Brown suggested no reason to doubt the integrity of their conduct in his case. A third officer was involved in "an unrelated matter" (filed under seal and not known to this Court) about seven years before Williams was shot. This officer interviewed witnesses who were on a bus at the time of the shooting and testified at Brown's trial. His testimony, however, was corroborated by the witnesses he interviewed. *See id.* at 666 & n.2. The court concluded that "Brown fails to show how the three officers' participation in his case—which was tangential at best—would have tipped the scales in any juror's mind." *Id.* at 675. It denied Brown leave to file a second § 2255 motion in the

11

district court. *See id.* at 676. The court did not say that impeaching information could never meet the high standard of § 2255(h)(1).

Similarly, other cases the Court has found in its (admittedly cursory) search to date involve newly discovered impeachment information about nonessential witnesses. *See, e.g., United States v. Lopez*, 577 F.3d 1053, 1057–58, 1067 (9th Cir. 2009) (previously undisclosed evidence of informant's unreliability was not material because informant provided no testimony implicating Lopez and jury heard "strong evidence of Lopez's guilt independent of Palmer's testimony"); [4] *Mandacina v. Entzel*, 991 F.3d 758, 761–62 (7th Cir. 2021) (noting that FBI agent's malfeasance in other cases would not meet standard of § 2255(h)(1) where his testimony was "not essential" and defendant did not claim "any of Craft's misconduct affected the investigation of [Mandacina's] case"); *Benjamin v. Eldridge*, No. 20-70935, 2021 WL 4947334 at *2 (9th Cir. Oct. 25, 2021) (denying leave to file a second § 2254 motion where previously undisclosed information would "merely impeach a witness who was already thoroughly impeached" and left "other evidence of Benjamin's guilt . . . unaffected"); *Bains v. Arnold*, 796 Fed. Appx. 932, 935 (9th Cir. 2019) (denying leave to file where previously undisclosed information concerned credibility of jailhouse snitch "who only met

---

[4] The sheer volume of discussion in *Brown* and *Lopez* is remarkable in light of the relatively inconsequential nature of the evidence at issue in those cases.

Bains in jail after Bains was detained" and did not "undermine or compromise the other evidence of Bains's guilt").

Here, by contrast, the cooperating witnesses were corroborated only by each other. Previously undisclosed information about their incentives to testify favorably to the prosecution may exist for any or all of them. In addition, Webster's trial counsel played phone calls for the jury in which Todd told Mayes what they might do to help themselves. He also called three "jailhouse snitches" who testified not about self-incriminating statements by Webster but about overhearing three of the cooperating witnesses, including Todd, colluding to set Webster up as "the fall guy." Trial counsel pointed out that neither he nor Webster was in a position to bestow favors on these witnesses as the United States could do with its own witnesses. In its rebuttal case at trial, the prosecution showed that all three of the supposed "colluding" witnesses made statements incriminating Webster before they were jailed together. But there was no real dispute that Webster was a friend of Todd and Mayes and accompanied them on trips to Montana. It seems unlikely that post-arrest jailhouse collusion was the only means cooperating witnesses would have had to settle on Webster as the person to use to curry favor with the prosecution.

In other words, there appears to be room for concern in Webster's case that he did not do what he was convicted of doing. When someone is present but not

participating in things happening around him, which is all that Dayley, for instance, said about Webster, *see, e.g.*, 1 Trial Tr. at 247:7–248:13, it is not very hard for a witness who is willing to lie to claim that the person did things he did not do. And even if Webster participated in some acts, that would not necessarily mean he was responsible for 228 ounces of methamphetamine.

The standard of § 2255(h)(1) is so high that additional information about favors or incentives given for testimony might never meet it. But the Court has not found a case that says so. It is reluctant to reach that conclusion in ignorance of what, if any, information was not disclosed to Webster's trial counsel. The United States must now do the investigation that should have been done before Webster's trial to find any previously undisclosed exculpatory or impeaching evidence about each of its cooperating witnesses.

Accordingly, IT IS ORDERED that the United States must respond to this Order on or before **February 16, 2022**.

DATED this 4th day of January, 2022.

Susan P. Watters
United States District Court